United States District Court
For the Northern District of California

1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10

| | |
|---|---|
| IN RE: | MDL Docket No 06-1791 VRW |
| NATIONAL SECURITY AGENCY TELECOMMUNICATIONS RECORDS LITIGATION | Case No C 07-0109 VRW |
| | ORDER |

This order pertains to:

AL-HARAMAIN ISLAMIC FOUNDATION, INC, an Oregon Nonprofit Corporation; WENDELL BELEW, a United States Citizen and Attorney at Law; ASIM GHAFOOR, a United States Citizen and Attorney at Law,

                        Plaintiffs,

v

BARACK H OBAMA, President of the United States; NATIONAL SECURITY AGENCY and KEITH B ALEXANDER, its Director; OFFICE OF FOREIGN ASSETS CONTROL, an office of the United States Treasury, and ADAM J SZUBIN, its Director; FEDERAL BUREAU OF INVESTIGATION and ROBERT S MUELLER III, its Director,

                        Defendants.
                                          /

1    Al-Haramain Islamic Foundation, Inc ("Al-Haramain"), an

2  Oregon nonprofit corporation, and two of its attorneys filed an

3  action for damages and equitable relief against the President of

4  the United States; the National Security Agency ("NSA") and its

5  Director; the Treasury Department's Office of Foreign Assets

6  Control ("OFAC") and its Director; and the Federal Bureau of

7  Investigation ("FBI") and its Director, Robert S Mueller III, in

8  both his official and personal capacities.  Plaintiffs allege that

9  defendants conducted an illegal and unconstitutional program of

10  electronic surveillance of United States citizens and entities.  On

11  March 31, 2010, the court granted plaintiffs' motion for summary

12  judgment of liability on their claim that defendants violated the

13  Foreign Intelligence Surveillance Act ("FISA"), 50 USC §§ 1801 et

14  seq.  The court dismissed the claims against FBI Director Mueller

15  in his personal capacity.  This order concerns plaintiffs' claims

16  for recovery of damages, equitable relief and attorney fees.

17    After plaintiffs prevailed on their FISA claim, they

18  requested recovery of damages.  Specifically, each plaintiff seeks

19  $20,400 in liquidated damages and $183,600 in punitive damages.

20  Doc ##723/117[1] at 2; 729/122.  For the reasons set forth below, the

21  court GRANTS the motion for liquidated damages as to plaintiffs

22  Ghafoor and Belew and awards liquidated damages to those plaintiffs

23  in the amount of $20,400 per plaintiff.  The court DENIES the

24  motion for liquidated damages as to plaintiff Al-Haramain.  The

25  court DENIES plaintiffs' motion for punitive damages.

26

27    [1]  Documents will be cited both to the MDL docket number (No M
28  06-1791) and to the individual docket number (No C 07-0109) in the
following format: Doc #(MDL)/(individual).

2

United States District Court
For the Northern District of California

Plaintiffs also seek equitable relief in two forms: (1) a declaration that defendants' warrantless electronic surveillance was unlawful as a violation of FISA; and (2) an order that any information obtained by means of the defendants' unlawful surveillance shall not be used by the United States government in any proceeding and shall be expunged from defendants' files and records. Doc #723/117. For the reasons set forth below, the court DENIES both requests for equitable relief.

Plaintiffs move for the entry of an award of attorney fees and expenses. Doc #738/128; 746/131; 748/132. For the reasons set forth below, the court GRANTS the motion of plaintiffs Ghafoor and Belew and awards attorney fees and expenses in the amount of $2,537,399.45. The court DENIES the motion of plaintiff Al-Haramain for attorney fees and expenses.

I

The factual background and procedural history of this litigation is thoroughly summarized in the March 31, 2010 order and will not be rescribed at length here. Doc #721/115. The facts relevant to the present order are as follows.

A

Shortly after the September 11, 2001 terrorist attacks, George W Bush, the President of the United States, authorized the NSA to engage in various new activities aimed at gathering intelligence. Doc #671-2/104-2 at 10. These activities are collectively known as the "President's Surveillance Program" ("PSP"), and all but one remain highly classified. Id at 6 & 10.

The only one of these activities that has been publicly disclosed, and the one that forms the basis for the plaintiffs' claims, is known as the "Terrorist Surveillance Program" ("TSP"). Id at 11. This program involved interception, without court order, of international communications where there was "a reasonable basis to conclude that one party to the communication is a member of al-Qa'ida, affiliated with al-Qa'ida, or a member of an organization affiliated with al-Qa'ida." Id (citation omitted). After its inception in late September 2001, the president reauthorized the PSP approximately every 45 days. Id.

On September 18, 2001, "Congress authorized the President to 'use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks' of September 11 in order to prevent 'any future acts of international terrorism against the United States.'" Doc #657-5/99-5 at 3. Between this date and December 16, 2005 (when the existence of the TSP was publicly revealed in media reports), NSA director Michael Hayden briefed various members of Congress on the PSP. Doc #657-2/99-2 at 3; Doc #671-2/104-2 at 21. According to Hayden, no member of Congress ever suggested that the NSA should discontinue the program. Doc #671-2/104-2 at 21.

Between October 2001 and May 2003, Deputy Assistant Attorney General John Yoo in the Department of Justice ("DOJ") Office of Legal Counsel ("OLC") was the only OLC official who was informed of the existence of the PSP. Doc #671-2/104-2 at 15. Yoo drafted a November 2, 2001 memo supporting the legality of the PSP and in particular focusing on the TSP and its legality in light of

**4**

United States District Court
For the Northern District of California

FISA. Id at 16. Yoo reasoned that FISA should not be construed to restrict the president's authority in the national security area in the absence of a clear statement in the statute and that such a construction would unconstitutionally infringe upon the president's Article II authority. Id at 17.

After Yoo resigned in May 2003, his successor, Patrick Philbin, was briefed on the PSP and became the new advisor to the Attorney General concerning the PSP. Doc #671-2/104-2 at 24. Philbin's supervisor, Assistant Attorney General Jack Goldsmith, was also briefed on the PSP. Id at 24-25. Philbin and Goldsmith found flaws in Yoo's legal analysis supporting the legality of the PSP. Id at 25. They noted that Yoo had failed to address a provision of FISA demonstrating that the statute was intended to apply to the president's wartime actions. Id. Philbin and Goldsmith began to develop a new analysis to support the legality of parts of the PSP (including the TSP) based on the 2001 Congressional Authorization for Use of Military Force ("AUMF"). Specifically, Philbin and Goldsmith noted that FISA prohibits electronic surveillance "except as authorized by statute," and posited that the AUMF statute implicitly authorized some PSP activities. Id. But Philbin and Goldsmith believed that even this analysis would not justify some of the activities conducted under the PSP. Id. They first shared their concerns with Attorney General Ashcroft in August 2003; Ashcroft gave Philbin permission to prepare a new memorandum analyzing the legality of the PSP. Id.

In December 2003, Philbin and Goldsmith began to discuss their concerns about the legality of the PSP with White House officials, including White House Counsel Alberto Gonzales and

United States District Court
For the Northern District of California

Counsel to the Vice President David Addington.  Doc #671-2/104-2 at 25.  That same month, James Comey was confirmed as Deputy Attorney General and was briefed on the PSP shortly thereafter.  Id at 26.  Comey also found Yoo's analysis of the program's legality to be questionable.  Id.

By early March 2004, Ashcroft and FBI Director Robert Mueller agreed that there were significant problems with the legal justification for some parts of the PSP.  Doc #671-2/104-2 at 26-27.  Ashcroft was hospitalized on March 4, 2004.  Id at 26.  On March 5, 2004, Gonzales spoke to Goldsmith and requested that the OLC produce a letter stating that Yoo's earlier memoranda had found the PSP to be legal, but Goldsmith, Philbin and Comey concluded that they could not certify this because Yoo's memoranda had not accurately described some of the PSP activities in discussing their legality.  Id at 27-27.  Between March 6 and March 9, Goldsmith, Philbin and Comey continued to discuss the PSP with White House officials including Gonzales and Addington and requested that certain activities be discontinued; White House officials disagreed with this request and pressed them for a reauthorization of the PSP, which was soon to expire.  Id at 27-28.

On the evening of March 10, 2004, Gonzales and White House Chief of Staff Andrew Card went to the hospital to persuade Ashcroft to reauthorize the PSP.  Doc #671-2/104-2 at 30.  Ashcroft stated his legal concerns with the PSP "in very strong terms" and told Gonzales that Ashcroft's deputy, Comey, was the acting Attorney General at the time.  Id.  Comey did not authorize the program.

On March 11, 2004, President Bush signed a new

United States District Court
For the Northern District of California

authorization for the PSP; instead of being certified by the
Attorney General, as in every previous instance, it was certified
by White House Counsel Gonzales.  Doc #671-2/104-2 at 31.  The
authorization asserted that the president's commander-in-chief
authority under Article II displaced any contradictory provisions
of law, including FISA.  Id.  Various DOJ and FBI officials,
including Ashcroft, Comey, Goldsmith and Mueller, considered
resigning if the president continued to operate the PSP without
approval of the Attorney General.  Id at 32.  President Bush met
with Comey and Mueller on March 12, 2004 and expressed his wish to
"fix" the legality of the PSP through legislative or other means
before May 6, 2004 (the day on which the current authorization was
set to expire).  Id at 33.

On March 12, 2004, Comey did not direct the FBI to stop
cooperating with the NSA on PSP activities.  Doc #671-2/104-2 at
33.  Instead, Goldsmith wrote a memorandum to Comey explaining that
the president had the constitutional duty to "take care that the
laws are faithfully executed" and that his determination of the
PSP's lawfulness was binding on the entire executive branch.  Id.
In the days following, Comey, Goldsmith and others continued to
express doubts that some of the PSP activities (not including the
TSP) could be legally supported.  Id at 33-34.  On March 17, 2004,
President Bush decided to modify or discontinue certain PSP
activities that DOJ officials had declared legally unsupportable.
Id at 34.

On May 6, 2004, Goldsmith and Philbin issued a new
memorandum supporting the legality of the PSP as revised by
President Bush.  Doc #671-2/104-2 at 34.  The memorandum explained

**United States District Court**
For the Northern District of California

that the 2001 AUMF authorizing "all necessary and appropriate force" to prevent future terrorist attacks also necessarily authorized targeted electronic surveillance against al-Qa'ida and affiliated groups and thereby justified the PSP.  Id at 34-35.

In the midst of these activities, the Department of the Treasury's OFAC blocked Al-Haramain's assets on February 19, 2004, pending an investigation for violations of tax and currency reporting laws.  Doc #458/35 at 7.  On September 9, 2004, OFAC declared Al-Haramain a "Specially Designated Global Terrorist" ("SDGT") organization.  Id at 8-9.

For almost seventeen months after Al-Haramain's designation as a SDGT organization, the DOJ continued to rely on the argument that surveillance under the PSP did not violate FISA because it was authorized by the AUMF statute.  Doc #657-5/99-5 at 3-4.  This was summarized in a DOJ white paper issued on January 19, 2006.  Id.  On February 1, 2007, President Bush allowed the final authorization for the PSP to expire.  Doc #671-2/104-2 at 35.

**B**

Plaintiffs filed their action in the United States District Court for the District of Oregon on February 28, 2006, alleging, among other things, that the NSA conducted electronic surveillance of telephonic attorney-client communications without obtaining a warrant or otherwise complying with FISA, and that the FBI used this surveillance in connection with OFAC's investigation of Al-Haramain.

On January 9, 2007, plaintiffs' action was transferred to this district.  On July 9, 2009, plaintiffs moved for partial

United States District Court
For the Northern District of California

summary judgment on the issue of defendants' liability under section 1810 of FISA. Doc #657/99. Defendants subsequently moved to dismiss the amended complaint and cross-moved for summary judgment. Doc #668/103. On March 31, 2010 the court issued a memorandum of decision and order granting plaintiffs' motion and denying defendants' motion (the "March 31 order"). Doc #721/115. As more fully described in the March 31 order, the court found that plaintiffs established standing on their FISA claim and established a prima facie case of electronic surveillance. Doc #721/115 at 2-3. Defendants failed to meet their burden to come forward with any evidence, in response to plaintiffs' prima facie case of electronic surveillance, that a FISA warrant was obtained or that the surveillance was otherwise lawful. Doc #721/115 at 3. Because there was no genuine issue of material fact whether a warrant was obtained for the electronic surveillance of plaintiffs or that such surveillance was otherwise lawful, this court granted plaintiffs' motion for summary judgment on the issue of defendants' liability under FISA, denied defendants' motion to dismiss the amended complaint and denied defendants' cross-motion for summary judgment. Doc #721/115 at 3. The court dismissed plaintiffs' claims against FBI Director Mueller in his personal capacity. Id.

        After prevailing on their motion for partial summary judgment, plaintiffs submitted a proposed judgment on April 16, 2010. Doc #723/117. Plaintiffs' proposed judgment seeks $20,400 in liquidated damages per plaintiff (computed at a rate of $100 per day, pursuant to 50 USC § 1801(a), for violations spanning a period of 204 days) and $183,600 in punitive damages per plaintiff, for a total award of $204,000 per plaintiff and a grand total of $612,000

United States District Court

For the Northern District of California

for all three plaintiffs. Doc #723/117. Plaintiffs' proposed judgment also seeks equitable relief in two forms: (1) a declaration that defendants' warrantless electronic surveillance of plaintiffs was unlawful as a violation of FISA; and (2) an order that any information obtained by means of defendants' unlawful surveillance shall not be used by the United States government in any proceeding and shall be expunged from defendants' files and records. Doc #723/117. Plaintiffs' proposed judgment also specified that plaintiffs would dismiss their remaining claims against defendants. Doc #723/117. Finally, plaintiffs' proposed judgment seeks reasonable attorney fees and other investigation and litigation costs (although the issue is not briefed in plaintiffs' proposed judgment). Doc #723/117.

Defendants responded to plaintiffs' proposed judgment and submitted an alternative form of judgment on April 30, 2010. Doc ##727/119; 727-1/119-1. Defendants' response argues that only plaintiffs Belew and Ghafoor are entitled to liquidated damages, in the amount of $1,000 per plaintiff. Doc #727-1/119-1 at 3. Defendants further contend that plaintiffs are not entitled to recover any punitive damages and are not entitled to any equitable relief. Doc #727-1/119-1 at 3.

On July 7, 2010, plaintiffs moved for an award of attorney fees. Doc #738/128. Plaintiffs' motion seeks $2,630,122.80 in attorney fees and $22,012.36 in expenses. Doc #738/128 at 11. Defendants opposed this motion, arguing that plaintiffs' requested fees are "excessive and unreasonable." Doc #746/131 at 4. Defendants argue that even if plaintiffs obtain all relief sought, no more than $606,116 could reasonably be awarded in

attorney fees, and that this amount would have to be reduced if punitive damages are not awarded.  Doc #746/131 at 6.  Defendants also argue that plaintiffs are not entitled to recover any of the claimed costs they seek.  Doc #746/131 at 26-27.

## II

## A

Each of the three plaintiffs seeks $20,400 in liquidated damages.  Doc #723/117.  In the event of a FISA violation, 50 USC § 1810(a) provides for recovery of "actual damages, but not less than liquidated damages of $1,000 or $100 per day for each day of violation, whichever is greater."  50 USC § 1810(a).  Plaintiffs do not request actual damages and instead seek liquidated damages based on the number of days that defendants violated FISA.  Doc #723/117.  Plaintiffs base the requested amount of $20,400 for each plaintiff on the inference that they were unlawfully surveilled for 204 days beginning February 19, 2004 (the date on which the Department of the Treasury blocked the assets of Al-Haramain and defendants announced the investigation of Al-Haramain) and ending September 9, 2004 (the date on which Al-Haramain was first designated as a Specially Designated Global Terrorist with ties to Osama bin Laden).  Doc ##721/115 at 38-39; 729/121 at 6-7; see Doc #727/119.

Defendants claim that plaintiffs lack evidentiary support for their conclusion that the surveillance lasted 204 days and should only recover the statutory minimum liquidated damages of $1,000 provided by 50 USC § 1801(a).  Doc #727/119 at 9-11.  Defendants point to plaintiff Belew's identification of ten

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

specific dates over three months in 2004 on which he spoke over the telephone with Al-Haramain director Soliman al-Buthi (also spelled "al-Buthe") in Saudi Arabia and plaintiff Ghafoor's statement that he spoke with al-Buthi "approximately daily from February 19 to February 29, 2004 and approximately weekly thereafter." Doc ##657-7/99-7 at 2; 657-6/99-6 at 2. Defendants claim that this is "the extent of the communications that plaintiffs' [sic] claim were unlawfully surveilled, and * * * the extent of the evidence submitted by plaintiffs as to the duration of any alleged surveillance." Doc #727/119 at 10.

The evidence in the record undermines defendants' argument. Plaintiffs have produced a wide range of evidence from unclassified sources that establishes a prima facie case showing that they were electronically surveilled. See March 31 order, Doc #721/115, for extended discussion. It is apparent that defendants continued to monitor plaintiffs over a prolonged period. Although the evidence does not disclose a precise start and end date of the surveillance, it is evident that it continued for at least the 204 days plaintiffs claim, if not longer. Plaintiffs' estimate of the duration of unlawful surveillance appears conservative. See Doc #729/121 at 7.

It is true that neither plaintiffs nor the court have been informed of the precise dates on which plaintiffs were surveilled. Defendants, the only parties who have access to this information, have not admitted or disclosed whether "plaintiffs were in fact subject to electronic surveillance" (Doc #727/119 at 12), although the fact of such surveillance is not in doubt. Defendants have had ample opportunity in this litigation to produce

12

**United States District Court**
For the Northern District of California

evidence in their exclusive possession concerning the details of the surveillance; they have simply chosen not to do so. Accordingly, the court must draw a reasonable inference regarding the length of the surveillance based on the evidence offered by plaintiffs to establish their prima facie case.

The evidence shows that an inferred surveillance period lasting from February 19, 2004 to September 9, 2004 is reasonable. Based on statements by the Office of Intelligence and Analysis, at least four of al-Buthi's telephone calls were intercepted as early as February 2003.  Doc #657-4/99-4 at 32-38.  Between this time and September 9, 2004, when the OFAC declared Al-Haramain a SDGT organization, governmental interest in Al-Haramain's activities appears to have increased.  Various officials involved acknowledged using surveillance and other classified information in this investigation.  See Doc #721/115 at 37-41.

Accordingly, the most reasonable inference is that defendants had already begun electronic surveillance of Al-Haramain before its assets were blocked on February 19, 2004 and continued the surveillance at least through September 9, 2004.  Plaintiffs Belew and Ghafoor were associated and in frequent contact with Al-Haramain and its officials during this time and were similarly subjected to electronic surveillance.  See Doc ##657-6/99-6; 657-7/99-7.  Although plaintiffs have not had access to classified information that could prove the precise details of defendants' surveillance, plaintiffs have nevertheless put forth sufficient evidence to raise a strong inference that the period of surveillance lasted at least 204 days.  Defendants have proffered nothing in response.  Accordingly, the motion of plaintiffs Ghafoor

United States District Court
For the Northern District of California

1  and Belew for statutory damages is GRANTED.  The court ORDERS that

2  plaintiffs Ghafoor and Belew shall each recover liquidated damages

3  in the amount of $20,400.

4        The distribution of any funds to plaintiff Al-Haramain is

5  impossible because Al-Haramain's assets are blocked as a result of

6  its designation as a SDGT organization.  Executive Order No 13,224

7  (66 CFR 49,079), issued pursuant to the International Emergency

8  Economic Powers Act (50 USC §§ 1701 et seq), authorizes the

9  Secretary of Treasury to designate any foreign person or group

10 engaging in or supporting terrorist activities as a SDGT and block

11 all assets of such person or group.  "[A]ny attachment, judgment,

12 decree, lien, execution, garnishment, or other judicial process is

13 null and void with respect to any property in which on or since the

14 effective date there existed an interest of a person whose property

15 or interests in property are blocked."  31 CFR 594.202.

16       Al-Haramain challenged its 2004 SDGT designation in an

17 action filed in the United States District Court for the District

18 of Oregon.  Al-Haramain Islamic Foundation, Inc v United States

19 Dept of the Treasury, 585 F Supp 2d 1233, 1239 (D Or 2008).  The

20 court found that the OFAC's designation was proper and dismissed

21 the complaint.  Id at 1273; Al-Haramain Islamic Foundation, Inc v

22 United States Dept of the Treasury ("Al-Haramain II"), 2009 US Dist

23 LEXIS 103373 at *52-53 (D Or).  Al-Haramain has appealed to the

24 Ninth Circuit.  Doc #727/119 at 13 n11.  As explained more fully

25 below in the discussion of punitive damages, there is ample

26 evidence supporting Al-Haramain's designation as a SDGT.

27       FISA specifies that a "foreign power or an agent of a

28 foreign power" is not eligible to recover damages under the

14

statute.   50 USC § 1810.   The statute broadly defines "foreign power" and specifically includes "a group engaged in international terrorism or activities in preparation therefor."   50 USC § 1801(a)(4).   As described in section IIC2, the OFAC has determined that Al-Haramain provided aid and support to terrorist organizations.   These activities, coupled with the fact that Al-Haramain was designated a SDGT organization, demonstrate that Al-Haramain is a "foreign power" that has engaged in "international terrorism or activities in preparation therefor" as defined in the FISA statute.   50 USC §§ 1801(a)(4), 1810.   Al-Haramain is therefore not entitled to recover any damages in this action.

        Plaintiffs propose that, in lieu of a transfer of compensatory damages to Al-Haramain's blocked account, the court order a cy pres distribution "to one or more other charitable organizations whose missions are 'consistent with the nature of the underlying action.'"   Doc #122 at 21 (quoting In re Agent Orange Product Liab Litig, 818 F2d 179, 186 (2d Cir 1987)).   Plaintiffs' cy pres argument fails at the threshold because, as described above, Al-Haramain is a "foreign power" under FISA and is therefore not entitled to any award of damages.   Moreover, even if Al-Haramain were entitled to recover damages, because Al-Haramain is a SDGT "any damages awarded to [Al-Haramain] would constitute assets in which it has a property interest, and any transfer of that interest by court order to any party would still be subject to the blocking and licensing requirement under CFR §§ 594.201(a), 202(b)."   Doc #730 at 26 n22.

        The cy pres doctrine is "a rule of construction used to preserve testamentary charitable gifts that otherwise would fail."

**15**

United States District Court

For the Northern District of California

<u>Democratic Cent Comm of Dist of Columbia v Washington Metro Area</u> <u>Transit Comm'n</u>, 84 F3d 451, 455 n1 (DC Cir 1996).  The doctrine has been extended by some courts to class actions, where undistributed damage or settlement funds may be distributed to the "next best" use when plaintiffs cannot be compensated individually.  Id at 455. "The object of applying funds to the 'next best' class is to parallel the intended use of the funds as nearly as possible by maximizing the number of plaintiffs compensated."  Id (citation omitted).

Plaintiffs have provided no precedent applying the cy pres doctrine to the distribution of a damages award in circumstances analogous to those at bar.  To do so here would require the court to speculate as to the "intended use of the funds" and the degree to which the missions of charitable organizations are "consistent with the nature of the underlying action."  <u>Democratic Cent Comm of DC</u>, 84 F3d at 455 n1; <u>In re Agent Orange</u>, 818 F2d at 186.  In the absence of any legal authority and any compelling reason, the court declines to apply the cy pres doctrine in this case.

Accordingly, the court DENIES plaintiff Al-Haramain's motion for recovery of statutory damages.

B

Plaintiffs seek two types of equitable relief.  First, plaintiffs seek a declaration that defendants' warrantless electronic surveillance of plaintiffs was unlawful as a violation of FISA.  Doc #723/117.  Second, plaintiffs seek an order directing that:

16

> [I]nformation obtained by means of plaintiffs' unlawful
> electronic surveillance shall not be used by the United
> States government, either directly or derivatively, in
> any administrative, civil or criminal proceeding in which
> the United States is a party.  Upon the final resolution
> of all such proceedings potentially involving such
> information, all files and records containing such
> information shall be purged and destroyed, except to the
> extent that defendants may have an existing legal
> obligation to preserve exculpatory evidence.

Doc #723/117 at 3.  Defendants argue that plaintiffs are not entitled to either form of equitable relief.  Doc #727/119.

The court first turns to plaintiffs' request for a declaration that the warrantless electronic surveillance of plaintiffs was unlawful as a violation of FISA.  Defendants argue that FISA does not authorize the entry of any declaratory relief.  Doc #727/119.  Defendants further argue that a declaratory judgment cannot issue if the "program or activity" no longer exists.  Doc #727/119.

It is unnecessary to decide whether and under what circumstances FISA authorizes the entry of a declaratory judgment because the equitable relief sought by plaintiffs is neither necessary nor appropriate.  This court already determined in its March 31 order that plaintiffs established a prima facie case of unlawful electronic surveillance in violation of FISA.  Doc #721/115 at 3.  In the present order, the court awards compensatory damages and attorney fees based on defendants' actions.  A declaration that defendants' actions were illegal would not provide plaintiffs with any additional relief or remedy.

Furthermore, because the TSP under which plaintiffs were monitored in violation of FISA ended in January 2007, Doc #668/103 at 18, there is no reason to believe that plaintiffs will be

17

subjected to the same injury in the future.  Under 28 USC § 2201, a declaratory judgment is available only when there is "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality."  <u>Golden v Zwickler</u>, 394 US 103, 108 (1969).  "[P]ast wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy."  <u>City of Los Angeles v Lyons</u>, 461 US 95, 103 (1983).  Accordingly, plaintiffs' request that the court declare defendants' actions unlawful is DENIED.

Plaintiffs' second request for equitable relief seeks an order prohibiting the United States government from using any information obtained during the surveillance at issue and ordering the destruction of such information.  Again, to enter declaratory relief, there must be an "actual controversy" before the court.  28 USC § 2201.  No such controversy exists here.

As authority for their request, plaintiffs cite a section of FISA authorizing the suppression of certain "unlawfully acquired" evidence.  Doc #723/117 at 2.  The suppression remedy authorized by FISA is limited to situations in which evidence obtained or derived from unlawful surveillance is used against an "aggrieved person" in "any trial, hearing, or other proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States [or] a State."  50 USC § 1806(e).  Upon the motion of the "aggrieved person" to the authority in that proceeding, evidence determined to be acquired unlawfully will be suppressed.  50 USC § 1806(g).  No party here has brought a motion to suppress evidence in an ongoing "trial, hearing, or other proceeding."  50 USC § 1806(e).  Plaintiffs'

request to have evidence "suppressed" for purposes of other, unnamed proceedings is not authorized by section 1806(e) or (g). Furthermore, the suppression remedy provided by section 1806 does not authorize the court to order expungement of records in the government's possession, and no other provisions of FISA authorize such a remedy.  For these reasons, plaintiffs' request that the information be suppressed and expunged is DENIED.

C

Plaintiffs seek punitive damages in the amount of $183,600 per plaintiff.  Doc #723/117.  The FISA statute provides that an "aggrieved person, other than a foreign power or an agent of a foreign power * * * who has been subjected to an electronic surveillance * * * in violation of Section 1809 of this title * * * shall be entitled to recover * * * punitive damages."  50 USC § 1810.  Plaintiffs claim that defendants conducted unauthorized electronic surveillance and are therefore liable for punitive damages.

As a threshold matter, plaintiff Al-Haramain is not eligible to recover punitive damages.  As explained in section IIA, Al-Haramain is a "foreign power" as defined in FISA and is therefore exempted from recovery of punitive damages.  50 USC § 1810.  Al-Haramain's motion for punitive damages is therefore DENIED.  The court will thus turn to the claims for punitive damages brought by plaintiffs Belew and Ghafoor.

1

It is settled law that municipalities are not liable for

**United States District Court**
For the Northern District of California

punitive damages.  In the context of cities and counties,
municipalities are not liable for punitive damages "unless
expressly authorized by statute."  <u>Cook County v United States ex
rel Chandler</u>, 539 US 119, 129 (2003) (quoting <u>Newport v Fact
Concerns, Inc</u>, 453 US 247, 260 n21 (1981)).  This rule is supported
both by a long history in the common law and by logic.  Punitive
damages serve the purpose "of punishing the defendant, of teaching
him not to do it again, and of deterring others from following his
example."  <u>Protectus Alpha Navigation Co v North Pacific Grain
Growers, Inc</u>, 767 F2d 1379, 1385 (9th Cir 1985) (quoting Prosser,
The Law of Torts § 2, at 9 (1971)).  None of these purposes is well
served by imposing penalties upon the taxpayers of a city or county
rather than the officials who are directly responsible for
wrongdoing.  The same reasoning applies to punitive damage awards
against the United States and its agencies, and the Supreme Court
has expressed its concern with "imposing punitive damages on
taxpayers under any circumstances."  <u>Vermont Agency of Natural
Resources v United States ex rel Stevens</u>, 529 US 765, 785 n15
(2000).

        The primary retributive purpose of punitive damages is
not advanced by laying the burden of punishment "upon the shoulders
of blameless or unknowing taxpayers."  <u>Newport</u>, 453 US at 267.
Punitive damages are not intended to compensate the injured
plaintiff, and in such a situation they "are in effect a windfall
to a fully compensated plaintiff, and are likely accompanied by an
increase in taxes or a reduction of public services for the
citizens footing the bill."  Id.  "Under ordinary principles of
retribution, it is the wrongdoer himself who is made to suffer for

his unlawful conduct," and "neither reason nor justice" suggests that taxpayers should suffer for the malicious acts of their officials.  Id.

The deterrent purpose of punitive damages is also ill served by imposing punitive damages upon the government.  It is far from clear that government officials will be meaningfully deterred from future acts of official conduct by the fear that punitive damages may be imposed upon the government.  It is possible that awards of punitive damages against municipalities or other governments may "induce voters to condemn official misconduct through the electoral process," but there is "no reason to suppose that corrective action, such as the discharge of offending officials who were appointed and the public excoriation of those who were elected, will not occur unless punitive damages are awarded against the municipality."  Newport, 453 US at 268.

Plaintiffs have requested punitive damages against four officials in their official capacities — President Barack Obama, NSA Director Keith Alexander, OFAC Director Adam Szubin and FBI Director Robert Mueller — as well as the NSA, the OFAC and the FBI as entities.  Doc #723/117 at 2.  A suit against an officer in his official capacity "is not a suit against the official but rather is a suit against the official's office," and is therefore a suit against the government.  Will v Michigan Dept of State Police, 491 US 58, 71 (1989) (quoting Brandon v Holt, 469 US 464, 471 (1985)).  Notably, none of the named defendants except Mueller held his office during the time of the illegal conduct at issue in this case.  This helps to illustrate the illogic of punitive damages here.  An award of punitive damages against the current president

1  based on the actions of his predecessor serves no coherent

2  retributive or deterrent purpose.

3         Plaintiffs argue that FISA expressly authorizes punitive

4  damages against the United States.  Doc #729/122 at 12.  This court

5  has previously ruled that the United States is included in the FISA

6  definition of "person" and that sovereign immunity has therefore

7  been waived.  <u>In re National Security Telecom Records Litig</u>, 564 F

8  Supp 2d 1109, 1124-25 (ND Cal 2008).  Plaintiffs argue that the

9  same reasoning exposes the government to punitive damages.  Doc

10 #729/122 at 12.  The plain text of 50 USC § 1810 states that an

11 aggrieved person "shall be entitled to recover" actual or

12 liquidated damages, punitive damages and attorney fees from "any

13 person who committed such violation," and does not explicitly

14 exempt the United States from punitive damages.  But this language

15 is by no means an express authorization of punitive damages.  The

16 court must assume that Congress is aware of existing law —

17 including the presumption against awarding punitive damages against

18 the government — when it passes legislation.  <u>Miles v Apex Marine</u>

19 <u>Corp</u>, 498 US 19, 32 (1990).  The legislature will not be presumed

20 to overturn long-established legal principles unless such intention

21 plainly appears in the statute.  See 73 American Jurisprudence 2d,

22 Statutes § 97.  Congress must surely have been aware of the long-

23 standing presumption against awarding punitive damages against the

24 government.  Nothing in the text of FISA can be read to explicitly

25 overturn the general presumption that it is not appropriate to

26 award punitive damages against the government.

27 //

28 //

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

2

Even if this court were to determine that Congress had authorized punitive damages against the United States under FISA, punitive damages would not be appropriate here.  As plaintiffs admit, FISA does not explicitly provide for mandatory recovery of punitive damages.  Both parties concede that section 1810(b) is silent as to how a court should decide whether to award punitive damages in a given case.  Doc ##729/122 at 13 (explaining that "the statute offers no guidance as to the specific standard a court is to apply when deciding whether to award such damages in a particular case"); 730/123 at 15 ("Section 1810 does not provide any standard governing the determination of whether punitive damages should be awarded").  Moreover, no judicial precedent elucidates the standard that applies to an award of punitive damages under FISA.  Doc #730/123 at 15.

Plaintiffs instead look to a statutory analogue, 42 USC § 1983 ("section 1983"), which concerns damages actions against government officials for depriving persons of federally secured rights.  Doc #729/122 at 13-14.  Defendants assume, for the sake of argument, that section 1983 provides a proper analogy.  Doc #730/123 at 15.  Under section 1983, punitive damages may be awarded for conduct found to be malicious, oppressive or in reckless disregard of a plaintiff's rights.  See Smith v Wade, 461 US 30, 56 (1983).  Stated somewhat differently, punitive damages may be appropriate "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  Id.  Further, any award of punitive damages must be based on harm

**United States District Court**
For the Northern District of California

caused by the defendants to the plaintiffs specifically, as opposed to nonparties to the action.  Philip Morris USA v Williams, 549 US 346, 353-55 (2007).

The punitive damages standard articulated in Wade was drawn from the common law of torts "with such modification or adaptation as might be necessary to carry out the purpose and policy of [section 1983]."  Wade, 461 US at 34.  The Court, finding "no reason why a person whose federally guaranteed rights have been violated should be granted a more restrictive remedy than a person asserting an ordinary tort cause of action," held that no such modification or adaptation was necessary.  Id at 48-49.

This reasoning applies equally to FISA, which was enacted primarily to safeguard the constitutional rights of United States citizens.  See Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities ("Church Committee Report") Book II: Intelligence Activities and the Rights of Americans, S Rep No 94-755, 289 (1976); Doc #453/33 at 10-14. Accordingly, this court will consider plaintiffs' request for punitive damages under FISA using the common law standard for awarding punitive damages as restated in Wade.  This court has found defendants liable for violating FISA for a period of 204 days between February 19, 2004 and September 9, 2004.  Punitive damages must be based on this particular conduct and not on any larger pattern of misconduct.

Plaintiffs argue that "defendants conducted plaintiffs' unlawful surveillance in reckless disregard of their rights, having acted 'in the face of a perceived risk' that the surveillance would 'violate the plaintiff's rights under federal law.'"  Doc #729/122

United States District Court
For the Northern District of California

at 16 (quoting Model Civ Jury Instr 9th Cir 5.5 (2008)).  Further, plaintiffs argue that the "unlawful surveillance was oppressive in that it occurred 'by misuse or abuse of authority or power.'"  Doc #729/122 at 17 (quoting Dang v Cross, 422 F3d 800, 809-10 (9th Cir 2005)).

        The court cannot find that the surveillance of plaintiffs in 2004 pursuant to the TSP involved "reckless or callous indifference to [their] federally protected rights."  Smith, 461 US at 56.  The record shows that the government had reason to believe that Al-Haramain supported acts of terrorism and that critical intelligence could be obtained by monitoring Al-Haramain.  Al-Haramain, 585 F Supp 2d at 1251-53.  The parent organization of plaintiff Al-Haramain is Al-Haramain Islamic Foundation ("AHIF").[2] AHIF is headquartered in Saudi Arabia and has had operations in as many as fifty countries "providing support for the [al-Qa'ida] network and promoting militant Islamic doctrine worldwide."  Id at 1241.  Among other activities, AHIF was involved in planning and financing terrorist attacks against United States embassies in Kenya and Tanzania and attempted attacks against United States consulates in India.  Id.  Beginning in 2002, the United States Secretary of Treasury designated numerous AHIF divisions around the world as SDGTs.  Id.  AHIF was designated as a SDGT on September 9, 2004.  Id at 1245-46.

        Al-Haramain was founded in Oregon between 1997 and 1999. Id at 1243.  In March 2000, Al-Haramain transferred $150,000 to

_____

        [2]   The Oregon branch of Al-Haramain, a plaintiff in this case, is consistently referred to as "Al-Haramain" in this order.  Its parent organization is consistently referred to as "AHIF."

United States District Court
For the Northern District of California

AHIF, which the OFAC believed was used to support terrorist activities by the Chechen mujahideen.  Id at 1243-45; Doc #657-4/99-4 at 34-36.  The OFAC began investigating Al-Haramain in February 2004 and first designated Al-Haramain as a SDGT on September 9, 2004.  Al-Haramain, 585 F Supp 2d at 1245-46; Doc #721/115 at 38-39.  Soliman al-Buthi, a founding member, was also designated a SDGT in September 2004.  Al-Haramain, 585 F Supp 2d at 1242.  Given the connections between Al-Haramain and AHIF, including the provision of funds that the OFAC believed were used to support terrorist activities, the court does not find that defendants' surveillance of Al-Haramain was conducted in reckless disregard for plaintiffs' rights.

While the facts show a clear dispute among DOJ and White House officials over the legality of some PSP activities, the evidence does not demonstrate that defendants knowingly acted in the face of a significant risk that their actions violated plaintiffs' rights.  Importantly, for the entire period at issue in this case, defendants relied upon legal analyses by the OLC supporting the legality of the TSP.  Between late 2001 and March 11, 2004, the TSP was operating under the authorization of the president and the certification of the attorney general.  Doc #671-2/104-2 at 16-18, 25, 31-32.  Yoo in the Office of Legal Counsel had provided an analysis supporting the legality of the TSP and other PSP activities.  Id.  After Yoo resigned in 2003, Philbin and Goldsmith began to share their concerns about the legality of some PSP activities with Ashcroft and White House officials.  But these concerns remained a matter of internal discussion and debate within the Office of Legal Counsel and in no way altered its prior

**United States District Court**
For the Northern District of California

official analysis stating that the PSP was legal.

In early 2004, various officials, including Ashcroft, Comey and Mueller, continued to voice concern regarding Yoo's analysis of the PSP. These concerns focused primarily on still-undisclosed "other activities" authorized under the PSP, not the TSP (the program at issue here). Doc #671-2/104-2 at 26-31. Then-White House Counsel Gonzales expressed disagreement with such criticisms, and the President reauthorized the PSP without the certification of the Attorney General on March 11, 2004. Id. On March 17, 2004, however, President Bush discontinued certain PSP activities that the DOJ believed were not legally supported. Id at 34. On May 6, 2004, Goldsmith and Philbin completed an analysis of the newly-modified PSP (including the TSP) and found it to be legally supported by the 2001 AUMF. Id. The DOJ has never repudiated this analysis or conclusion. Therefore, despite the high-level disagreement over the legality of certain aspects of the PSP, there is no basis to find that defendants acted in the face of a significant risk that their actions violated plaintiffs' legal rights or that defendants engaged in "misuse or abuse of authority or power."

Plaintiffs repeatedly emphasize the weakness of the legal rationales advanced for the TSP and have apparently inferred that defendants acted in bad faith. This court has, of course, held that plaintiffs established a prima facie case that defendants' actions were in violation of FISA and that defendants did not rebut this showing. Questions of defendants' intent, however, are more difficult than plaintiffs allow.

For the reasons made clear momentarily, the court has

little difficulty concluding that the government's conduct here does not merit imposition of punitive damages.  In doing so, however, the undersigned must acknowledge that the facts of this case, at a minimum, do not cast a flattering light on certain executive branch officials.  Wholly apart from the apparent weakness of Yoo's legal analysis, it is disquieting that for more than a year and a half, sole responsibility for determining the legality of the TSP was reposed in a single official.

This aside, it is essential to remember that the precise limits of the president's power to act in defense of the nation are not specifically delineated, and due to the nature of our Constitution will never be spelled out in every detail. Intelligent and sincere officials disagree about the scope of these powers, and the existence of such disagreement should not in every case prevent action from being taken.  The president and other senior executive branch officials responsible for national security necessarily bear some risk that their actions may one day be held to be unlawful; they must balance this risk against the harm that may come to the nation if they fail to act.  While the court has the constitutional duty to apply the law in cases before it and hold violators accountable, it need not mete out punitive measures on officials for perceived "recklessness" in dealing with a serious, proven threat to the national security.

For these and the foregoing reasons, the motion of plaintiffs Ghafoor and Belew for punitive damages is DENIED.

D

As the prevailing parties on their claims under FISA,

28

United States District Court

For the Northern District of California

plaintiffs Ghafoor and Belew may recover their reasonable attorney fees and costs of suit. 50 USC § 1810. Defendants do not dispute that FISA provides for fee-shifting to a prevailing plaintiff. Defendants contend, however, that an award of attorney fees and costs is premature and, in any event, dispute plaintiffs' calculation of attorney fees and costs.

As discussed in section IIA, Al-Haramain is a "foreign power" as defined by FISA. FISA specifically exempts foreign powers from recovery of attorney fees and expenses. 50 USC §§ 1810(b) and (c). The motion of Al-Haramain for attorney fees and litigation expenses is therefore DENIED.

The court thus turns to the claims for attorney fees and expenses brought by plaintiffs Belew and Ghafoor. Despite defendants' protestations, it is not premature to address this issue. The Federal Rules of Civil Procedure establish that "[u]nless * * * a court order provides otherwise," a motion for attorney fees must be filed "no later than 14 days after the entry of judgment." FRCP 54(d)(2)(B)(i). The notes of the advisory committee specifically state that the rule "permits the court to require submissions of fee claims in advance of entry of judgment." FRCP 54, Notes of Advisory Committee on 1993 amendments. Although the court has granted a motion for summary judgment on the issue of liability, defendants claim that they cannot fully address the reasonableness of a fee award without knowing the specific amount of damages awarded. Doc #746/131 at 8-9. But defendants have argued at length that the amount requested by plaintiffs is excessive and unreasonable even if the full amount of damages sought is obtained and have specifically addressed the

**United States District Court**
For the Northern District of California

proportionality of the requested fee in relation to various hypothetical damages awards.  Doc #746/131 at 7-9, 16-17.  Having effectively disputed plaintiffs' attorney fee motion, defendants' argument that it is premature to address the issue fails.

Plaintiffs propose that the fee award be calculated by a straightforward application of the lodestar approach.  Doc #738/128 at 3.  This approach starts by multiplying "the number of hours reasonably expended on the litigation" by "a reasonable hourly rate."  <u>Hensley v Eckerhart</u>, 461 US 424, 433 (1983).  This method has "achieved dominance in the federal courts" and has "become the guiding light of [the Supreme Court's] fee-shifting jurisprudence."  <u>Perdue v Kenny A</u>, 130 S Ct 1662, 1672 (2010) (quoting <u>Gisbrecht v Barnhart</u>, 535 US 789, 801 (2002)).

1

To determine reasonable hourly rates in a case involving attorneys with widely varying experience and billing rates, this court uses the well-established <u>Laffey</u> matrix.  See <u>Laffey v Northwest Airlines, Inc</u>, 572 F Supp 354 (DDC 1983), aff'd in part, rev'd in part on other grounds, 746 F2d 4 (DC Cir 1984).  This matrix compiles average billing rates for attorneys in the District of Columbia area, divided into categories based on years of experience.  See http://www.justice.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_8.html.  Because the cost of living in the District of Columbia differs from that of other cities, the court will adjust the rates to the appropriate locality using the federal locality pay differentials based on federally compiled cost of living data.  See, for example, <u>In re HPL Technologies, Inc</u>

<u>Securities Litigation</u>, 366 F Supp 2d 912, 921 (ND Cal 2005).

Defendants argue that the <u>Laffey</u> rates should be adjusted for the locality in which each of plaintiffs' attorneys operates rather than for the locality where the district court sits.  Doc #746/131 at 26.  Although the undersigned declined to adjust for the locality of the district court in one unusual case involving two actions pending simultaneously in two district courts, see <u>Martin v FedEx Ground Package System</u>, 2008 WL 5478576, *1-2, 7 (ND Cal 2008), the Ninth Circuit has held that "[g]enerally, when determining a reasonable hourly rate, the relevant community is the forum in which the district court sits." <u>Prison Legal News v Schwarzenegger</u>, 608 F3d 446, 454-55 (9th Cir 2010) (quoting <u>Camacho v Bridgeport Fin, Inc</u>, 523 F3d 973, 979 (9th Cir 2008)).  Accordingly, the court will use the San Francisco Bay area as the locality in computing all rates.

Plaintiffs propose that the court use the current hourly rates from the <u>Laffey</u> matrix for all the hours worked going back to 2005.  Doc #748/132 at 19.  As a general matter, a trial court has the discretion to apply current rates to all hours billed over the course of the litigation as a means of compensating a plaintiff's attorney for the delay in payment.  <u>Welch v Metropolitan Life Ins Co</u>, 480 F3d 942, 947 (9th Cir 2007) (citing <u>In re Wash Pub Power Sys Sec Litig</u>, 19 F3d 1291, 1305 (9th Cir 1994)).  Alternately, a court may use the attorney's historical rates and add an enhancement in the form of interest based on the prime rate.  Id.  But this principle of compensating for delay does not apply in suits against the United States.  Rather, the longstanding "no-interest rule" holds that "[i]n the absence of express

United States District Court
For the Northern District of California

congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award." <u>Library of Congress v Shaw</u>, 478 US 310, 314 (1986).  In the Ninth Circuit's view, an award of attorney fees at current rates is tantamount to an award of interest.  See <u>Sorenson v Mink</u>, 239 F3d 1140, 1148 (9th Cir 2001).[3]  Because Congress has not consented to an award of interest in cases such as this, the court is constrained to use historical rates.  Moreover, there is a relatively modest difference between the use of current rates ($2,724,355.79) compared to historical rates ($2,515,387.09). Because the weight of authority supports the use of historical rates and because the difference between the two awards is not great, the attorney fees here will be calculated based on historical rates.

          To calculate the amount of compensation for each attorney for each year the court must first determine each attorney's years of experience and then find the rate for the appropriate year in the <u>Laffey</u> matrix.  This rate must then be adjusted based on the federal locality pay differential for that year.  See http://www.opm.gov/oca/10tables/index.asp and linked pages for historical data.  Finally, this rate is multiplied by the number of hours the attorney worked in that year.  The <u>Laffey</u> matrix provides

---

[3]     The Ninth Circuit appears to conflate compensation for the delay in payment with compensation for the erosion in the value of money (inflation).  But the concepts are distinct; the former typically takes the form of interest while the latter typically entails a price or cost of living adjustment.  Where litigation spans a lengthy period or interest rates are high, or both, using current billing rates instead of historical billing rates with interest can significantly under-compensate prevailing parties or their counsel. See <u>Theme Promotions, Inc v News America Marketing FSI, Inc</u>, __ F Supp 2d __, 2010 WL 2464961 (ND Cal 2010).

billing data for each year starting with June 1 and running to the following May 31.  Accordingly, the number of hours worked per year is calculated based on the same dates.  The federal locality pay differential and the attorney's years of experience are calculated based on the later date; for example, for the <u>Laffey</u> year June 1, 2009 - May 31, 2010, both the locality pay and years of experience are calculated using 2010 data.  The only exception is the final <u>Laffey</u> year, June 1, 2010 - May, 31, 2011; because 2011 locality pay information is not yet available, data from 2010 are used.

Table 1: Years of Experience of Plaintiffs' Counsel

| Name | 2006 | 2007 | 2008 | 2009 | 2010 |
|------|------|------|------|------|------|
| Eisenberg | 27 | 28 | 29 | 30 | 31 |
| Hancock | 24 | 25 | 26 | 27 | 28 |
| Goldberg | 31 | 32 | 33 | 34 | 35 |
| Nelson | 33 | 34 | 35 | 36 | 37 |
| Jaskol | 18 | 19 | 20 | 21 | 22 |
| Hassan | 10 | 11 | 12 | 13 | 14 |
| Albies | 1 | 2 | 3 | 4 | 5 |
| Kreuscher | 0 | 1 | 2 | 3 | 4 |

Table 2: <u>Laffey</u> Rates for Plaintiffs' Counsel

| Name | 2005-06 | 2006-07 | 2007-08 | 2008-09 | 2009-10 | 2010-11 |
|------|---------|---------|---------|---------|---------|---------|
| Eisenberg | $405 | $425 | $440 | $465 | $465 | $475 |
| Hancock | $405 | $425 | $440 | $465 | $465 | $475 |
| Goldberg | $405 | $425 | $440 | $465 | $465 | $475 |
| Nelson | $405 | $425 | $440 | $465 | $465 | $475 |
| Jaskol | $360 | $375 | $440 | $465 | $465 | $475 |
| Hassan | $290 | $375 | $390 | $410 | $410 | $420 |
| Albies | $195 | $205 | $215 | $270 | $270 | $275 |
| Kreuscher | $195 | $205 | $215 | $225 | $270 | $275 |

**United States District Court**
For the Northern District of California

**Table 3: Federal Locality Pay Differentials and Adjustments[4]**

| Year | San Francisco | Washington, DC | Adjustment |
|------|--------------|----------------|-----------|
| 2010 | 35.15% | 24.22% | 8.80% |
| 2009 | 34.35% | 23.10% | 9.14% |
| 2008 | 32.53% | 20.89% | 9.63% |
| 2007 | 30.33% | 18.59% | 9.90% |
| 2006 | 28.68% | 17.50% | 9.52% |

**Table 4: Laffey Rates Adjusted to San Francisco**

| Name | 2005-06 | 2006-07 | 2007-08 | 2008-09 | 2009-10 | 2010-11 |
|------|---------|---------|---------|---------|---------|---------|
| Eisenberg | $443.56 | $467.07 | $482.37 | $507.50 | $505.91 | $516.79 |
| Hancock | $443.56 | $467.07 | $482.37 | $507.50 | $505.91 | $516.79 |
| Goldberg | $443.56 | $467.07 | $482.37 | $507.50 | $505.91 | $516.79 |
| Nelson | $443.56 | $467.07 | $482.37 | $507.50 | $505.91 | $516.79 |
| Jaskol | $394.27 | $412.12 | $482.37 | $507.50 | $505.91 | $516.79 |
| Hassan | $317.61 | $412.12 | $427.55 | $447.47 | $446.08 | $456.96 |
| Albies | $213.56 | $225.29 | $235.70 | $294.68 | $293.76 | $299.20 |
| Kreuscher | $213.56 | $225.29 | $235.70 | $245.56 | $293.76 | $299.20 |

2

Plaintiffs have submitted affidavits from the eight attorneys who worked on the case summarizing the various tasks performed and the number of hours spent on each task.  See Doc ##738-1/128-1 to 738-8/128-8; 748/132 at 20 n8.  Because the Laffey matrix provides billing data for each year starting with June 1 (and ending the following May 31), the hours worked by each attorney have been divided in the same way.  When a summarized task

---

[4]   The adjustment represents the percentage by which the Washington, DC rate must be multiplied to calculate the San Francisco rate, that is: ((100 + SF) - (100 + DC)) / (100 + DC).  For example, for 2010, (135.15 - 124.22)/(124.22) = 8.80.

fell into more than one year, the hours were counted toward the
year in which the task ended.  The total number of hours worked by
each lawyer for each Laffey year is given in the first table below;
the combined number of hours is 5518.8.  The second table below
contains the total fee award for each attorney and combined.

Table 5: Hours Worked by Plaintiffs' Counsel by Laffey Years

| Name | 2005-06 | 2006-07 | 2007-08 | 2008-09 | 2009-10 | 2010-11 |
|------|---------|---------|---------|---------|---------|---------|
| Eisenberg | 129.1 | 582.9 | 630.8 | 688.9 | 409.4 | 97.9 |
| Hancock | 0 | 30.1 | 72.2 | 55.9 | 64.7 | 18.9 |
| Goldberg | 89 | 137.2 | 176.5 | 123.2 | 123.8 | 41.3 |
| Nelson | 273.8 | 287.2 | 200.8 | 34 | 113 | 7.1 |
| Jaskol | 38 | 124 | 39.4 | 62.2 | 15.4 | 13.1 |
| Hassan | 78.2 | 94.4 | 73 | 51 | 33.4 | 17.7 |
| Albies | 139.3 | 174.9 | 55.5 | 21.7 | 66.6 | 12.9 |
| Kreuscher | 0 | 18.5 | 0 | 0 | 0 | 1.9 |

Table 6: Attorney Fee Award by Individual and Total

| Name | Attorney fee award |
|------|-------------------:|
| Jon B Eisenberg | $1,241,127.74 |
| William N Hancock | $119,754.88 |
| Steven Goldberg | $335,196.23 |
| Thomas H Nelson | $430,541.17 |
| Lisa Jaskol | $131,217.98 |
| Zaha S Hassan | $140,760.61 |
| J Ashlee Albies | $112,052.13 |
| Kenneth A Kreuscher | $4,736.35 |
| TOTAL | $2,515,387.09 |

Defendants argue that the number of hours for which
plaintiffs seek compensation is unreasonable for a variety of
reasons.  Defendants first claim that "the documentation provided

by plaintiffs is plainly inadequate" because plaintiffs have
provided declarations summarizing their work rather than
contemporaneous billing records. Doc #746/131 at 5. Plaintiffs
have complied with Local Rule 54-5, which requires that a motion
for attorney fees be supported by "declarations or affidavits"
containing a "statement of the services rendered by each person for
whose services fees are claimed together with a summary of the time
spent by each person." Defendants imply that <u>Hensley</u>, which holds
that a prevailing party "should maintain billing time records in a
manner that will enable a reviewing court to identify distinct
claims," effectively nullifies the rule by requiring a district
court in every case to examine such detailed billing records.
<u>Hensley</u>, 461 US at 437. Plaintiffs have maintained contemporaneous
time records, see Doc #748/132 at 7, and Local Rule 54-5 allows a
court to require production of these for in camera inspection.
Such a production is not necessary here. The court has no
difficulty in determining from plaintiffs' detailed billing
summaries that their legal work was related to the successful FISA
claims of Ghafoor and Belew. As discussed in more detail below,
even though only these two plaintiffs ultimately have succeeded on
only one of their original six claims, all of the claims "involve a
common core of facts or [are] based on related legal theories" and
therefore "cannot be viewed as a series of discrete claims."
<u>Hensley</u>, 461 US at 435.

Defendants similarly object to plaintiffs' summaries as a
form of "block billing." Doc #746/131 at 5. But again, according
to plaintiffs' sworn declarations, detailed contemporaneous time
records have in fact been kept throughout the litigation and may be

reviewed by the court.  Using these records to create the summaries required by the local rules does not amount to an objectionable form of "block billing."

Defendants maintain that plaintiffs' fee award should be reduced due to "overstaffing and duplicative work by multiple counsel on the same task."  Doc #746/131 at 14.  Defendants argue that "[a]t most, a reasonable fee would compensate two attorneys" for attending various hearings in this case.  Id at 15.  As the lengthy procedural history makes clear, this case has been vigorously litigated.  Defendants frequently sent three or four government attorneys to attend hearings.  Doc ##746/131 at 17; 748/132 at 11-12.  Indeed, defendants utilized at least twenty-two different government attorneys to write briefs and to attend hearings.  Doc #748/132 at 11.  Even if defendants proved that two attorneys at a hearing is "reasonable" in the abstract, their own litigation practices confirm that plaintiffs' use of resources was reasonable in this particular case.  "The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response."  <u>Copeland v Marshall</u>, 641 F2d 880, 904 (DC Cir 1980).

The fact that seven attorneys seek compensation for working on each of several important motions also does not demonstrate the "excess" and "needless duplication" alleged by defendants.  Doc #746/131 at 14.  The declarations of plaintiffs' attorneys demonstrate that different attorneys worked on different elements of the larger project.  See, for example, Doc #748/132 at 12.  This appears to be an efficient division of labor among a team whose members each specialize in particular tasks.

United States District Court
For the Northern District of California

          Defendants argue that plaintiffs have not attempted to
exercise billing judgment because they have "simply summarized all
of the hours and activities they undertook since 2006."  Doc
#746/131 at 4-5.  It is true that a fee applicant should "exercise
'billing judgment' with respect to hours worked."  <u>Hensley</u>, 461 US
at 437.  However, defendants' argument "misreads the mandate of
<u>Hensley</u>" by suggesting that an attorney "should necessarily be
compensated for less than the actual number of hours spent
litigating the case."  <u>City of Riverside v Rivera</u>, 477 US 561, 570
n4 (1986) (plurality).  Rather, the law requires that the number of
hours for which an attorney seeks compensation be "reasonable."
Id.

          As Judge Kozinski has explained, "lawyers are not likely
to spend unnecessary time on contingency fee cases in the hope of
inflating their fees" because "[t]he payoff is too uncertain, as to
both the result and the amount of the fee."  <u>Moreno v City of
Sacramento</u>, 534 F3d 1106, 1112 (9th Cir 2008).  "By and large, the
court should defer to the winning lawyer's professional judgment as
to how much time he was required to spend on the case; after all,
he won, and might not have, had he been more of a slacker."  Id.
This reasoning is especially apt here.  Plaintiffs are the only
parties to have obtained a liability finding on a FISA claim in
this multi-district litigation concerning warrantless electronic
surveillance.  Plaintiffs had little reason to believe that they
would recover anything at all when this case began.  It is
therefore unlikely that plaintiffs' attorneys, believing that they
were probably working pro bono and trying to fit the case into a
schedule that also included work for paying clients, spent more

time than they felt was absolutely necessary to win the case.

3

Defendants also argue that plaintiffs' fee award should not include "unproductive" or "unnecessary" hours.  Doc #746/131 at 3.  By this, defendants mean "hours that had no direct bearing on the grant of partial summary judgment on plaintiffs' FISA claim."  Doc #746/131 at 3.  Defendants point to various issues throughout the litigation that have been resolved in their favor — such as the government's successful assertion of the state secrets privilege, plaintiffs' failed attempts to obtain access to classified information, plaintiffs' failure in July 2008 to present enough evidence to establish standing, and a handful of other motions — and suggest that the hours spent on these issues should not be compensated because they had no bearing on the grant of summary judgment.  Doc #746/131 at 19-23.  What defendants propose is close to the "mathematical approach comparing the total number of issues in the case with those actually prevailed upon" that was rejected in Hensley.  461 US at 435 n11.

To take one particular example, defendants argue that it would be unreasonable for plaintiffs to be compensated for the time spent between July 2008 and June 2009 fighting to gain access to classified information because this dispute "ended in no access being granted."  Doc #746/131 at 22-23.  Of course, the reason that plaintiffs never gained access to the information is that defendants disobeyed direct court orders to negotiate an appropriate protective order and to give plaintiffs' counsel access to some of the information once they had obtained security

**United States District Court**
For the Northern District of California

clearances.  See Doc #721/115 at 16-18.  Defendants claim that
because "the Court declined to enter any sanctions or issue a
protective order granting the disclosure of classified information
to plaintiffs' counsel," they essentially won the issue.  Doc
#746/131 at 23.  A defendant "cannot prolong the litigation through
its own obdurate behavior and then protest that [plaintiffs'
counsel] has spent too much time prosecuting the action."  O'Neill,
Lysaght & Sun v Drug Enforcement Admin, 951 F Supp 1413, 1426 (CD
Cal 1996).  The time spent by plaintiffs' counsel seeking access to
classified information was made necessary by defendants' litigation
tactics and is therefore compensable.

          Defendants correctly point out that "the most critical
factor" in determining whether a fee award is reasonable is "the
degree of success obtained."  Hensley, 461 US at 436.  In
particular, when a plaintiff succeeds on only some claims for
relief, two questions must be addressed: "First, did the plaintiff
fail to prevail on claims that were unrelated to the claims on
which he succeeded?  Second, did the plaintiff achieve a level of
success that makes the hours reasonably expended a satisfactory
basis for making a fee award?"  Id at 434.  "A plaintiff is not
eligible to receive attorney's fees for time spent on unsuccessful
claims that are unrelated to a plaintiff's successful * * * claim,"
and is not entitled to a fee award not "commensurate with the
extent of the plaintiff's success."  McCown v Fontana, 550 F3d 918,
923-24 (9th Cir 2008) (quotation omitted).  "A reduced fee award is
appropriate if the relief, however significant, is limited in
comparison to the scope of the litigation as a whole."  Hensley,
461 US at 439.  But "[w]here a plaintiff has obtained excellent

results, his attorney should recover a fully compensatory fee," which normally "will encompass all hours reasonably expended on the litigation," and may justify an enhanced award "in some cases of exceptional success."  Hensley, 461 US at 435.

Although plaintiffs Belew and Ghafoor have prevailed on only one of their six original claims for relief, it is clear that the remaining five claims — rising from violations of the First, Fourth and Sixth Amendments, as well as the principle of separation of powers and the International Covenant on Civil and Political Rights — "involve a common core of facts" and are "based on related legal theories."  Doc #458/35 at 14-16; Hensley, 461 US at 435. Each of these claims was based on the same instances of the government's illegal wiretapping of plaintiffs, and each sought to vindicate plaintiffs' legal and constitutional rights against claims of expanded executive power.  Plaintiffs "in good faith * * * raise[d] alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee."  Hensley, 461 US at 435. Nor should the overall award of attorney fees be reduced because Al-Haramain is not entitled to recover damages or attorney fees. The surveillance of plaintiffs Al-Haramain, Ghafoor and Belew involved the same set of facts.  As a result, the litigation involving the surveillance of Al-Haramain cannot be separated from the litigation involving the surveillance of Belew and Ghafoor.

This court must also consider whether the level of success achieved is commensurate with the fee award requested by plaintiffs' counsel.  Although plaintiffs Belew and Ghafoor have fully obtained the $100 per day of liquidated damages sought for a

United States District Court

For the Northern District of California

total of $40,800, they have obtained none of the $1,000,000 of punitive damages requested in the first amended complaint or the $550,800 of punitive damages requested in the proposed judgment. Doc ##458/35 at 16; 723/117 at 2.  Similarly, Al-Haramain is barred from recovering any relief and none of the plaintiffs have obtained the equitable relief sought.  Doc ##458/35 at 16; 723/117 at 3.

The Supreme Court has previously rejected a rule of proportionality between damages recovered in a civil rights case and attorney fees awarded under a fee-shifting statute.  See City of Riverside v Rivera, 477 US 561, 574 (1986) (plurality); Id at 585 (Powell concurring).  "Where recovery of private damages is the purpose of a civil rights litigation, a district court, in fixing fees, is obligated to give primary consideration to the amount of damages awarded as compared to the amount sought."  Id at 585 (Powell concurring).  But "[i]n some civil rights cases, * * * the court may consider the vindication of constitutional rights in addition to the amount of damages recovered."  Id.  Because damages recovered in such cases "contribute[] significantly to the deterrence of civil rights violations in the future" and otherwise "serve[] the public interest," the "damages award[ed] do not reflect fully the public benefit advanced" by the litigation.  Id at 574-75.

FISA was enacted primarily to address Congress's concern that the constitutional rights of American citizens were being undermined by various intelligence activities.  See Church Committee Report, S Rep No 94-755, 289 (1976); Doc #453/33 at 10-14.  Plaintiffs' success in obtaining damages under FISA must therefore be viewed as a vindication of constitutional rights that

serves the greater public interest.  This court's judgment under FISA awarding damages against defendants for unlawful surveillance, as well as its previous order holding that the state secrets privilege is preempted by FISA, contributes to the deterrence of future violations of constitutional rights by warrantless wiretapping.  For these reasons, strict proportionality here is a particularly unsuitable measure of the reasonableness of plaintiffs' requested attorney fees.

"Where the relief sought and obtained is limited to money, the terms 'extent of success' and 'level of success' are euphemistic ways of referring to money."  <u>McGinnis v Kentucky Fried Chicken</u>, 51 F3d 805, 810 (9th Cir 1995).  But this case, from the start, has been about more than money.  Plaintiffs began this litigation five years ago because they believed that they had been illegally wiretapped by executive branch officials and wanted both to vindicate their own constitutional rights and enforce the laws that they believed were being violated.  With the award of liquidated damages under FISA, plaintiffs have essentially obtained what they sought.

The difficulties faced and overcome by plaintiffs in this case add significantly to their "level of success."  Plaintiffs here stand alone among the dozens of plaintiffs in this consolidated litigation that have had any success in pursuing claims against the government.  The government has fiercely litigated this case from the beginning and has used every available tactic in defense.  Plaintiffs have gone to extraordinary lengths in their attempts to obtain classified evidence from in the government's possession and have ultimately managed to win their

case despite the government's refusal to provide them with this evidence.  Plaintiffs' counsel have clearly obtained "excellent" results for their clients and accordingly are entitled to a "fully compensatory fee" that includes "all hours reasonably expended on the litigation."  <u>Hensley</u>, 461 US at 435.  Accordingly, the court GRANTS the motion for attorney fees brought by Belew and Ghafoor and awards $2,515,387.09.  The court DENIES the motion for attorney fees brought by Al-Haramain.

4

Plaintiffs also request to be compensated for a total of $22,012.36 in expenses.  Doc #738/128 at 11.  FISA provides that, in addition to "reasonable attorney's fees," a prevailing party may recover "other litigation and investigation costs reasonably incurred."  50 USC § 1810(c).  Even absent express statutory authority, judges are authorized to award certain specific litigation-related expenses, known as "taxable costs," to a prevailing party.  28 USC § 1920.  The specific authorization of FISA goes further than this, though, and clearly contemplates recovery of additional "non-taxable" costs.  In any case, federal fee-shifting statutes awarding "reasonable attorney's fees" may include various non-taxable costs at the court's discretion.  <u>Grove v Wells Fargo Financial California, Inc</u>, 606 F3d 577, 579-81 (9th Cir 2010).  This award may include such expenses as travel and computerized legal research if it is standard practice in the local legal community to bill these expenses separately from hourly rates.  Id.

Attorneys Albies, Eisenberg, Jaskol, Goldberg and Hassan

44

United States District Court
For the Northern District of California

1  describe in their declarations the expenses for which they seek

2  compensation; the total amount is is $8,808.18.  Doc ##738-2/128-2 at

3  5-6; 738-3/128-3 at 13; 738-5/128-5 at 8; 738-6/128-6 at 9-10; 738-

4  8/128-8 at 7.  These expenses relate to travel, computerized legal

5  research and courier services, and all of the attorneys state that

6  they believe that such expenses are normally billed separately from

7  hourly rates in their communities.  Id.  This is a small figure in

8  the context of litigation that has lasted nearly five years, and an

9  inspection of the declarations reveals that the attorneys have

10  omitted a large percentage of the expenses that they must have

11  incurred in this litigation.  The court finds that the request for

12  expenses is reasonable.

13          Attorney Thomas Nelson seeks reimbursement for $6,715.00

14  that he paid to an ethics consultant and $6,489.18 that he spent on

15  travel.  Doc #738-7/128-7 at 4-6.  Mr. Nelson retained the ethics

16  consultant, Mark Fucile, to help him decide an ethical matter that

17  he felt was "unprecedented" – that is, what he should do to protect

18  the confidential communications of his client when he had reason to

19  believe that the government was monitoring his client.  Id at 5-6;

20  Doc #748-1/132-1 at 3-4.  Based on the same concerns, Mr. Nelson

21  felt compelled to discuss confidential matters in person rather

22  than through electronic communications, which required him to

23  travel.  Doc #748-1/132-1 at 3.  He seeks reimbursement for two

24  trips to Saudi Arabia, two trips to Washington, D C, and three

25  trips to San Francisco, although he claims to have "made

26  approximately 40 trips to the Middle East" to provide legal counsel

27  to the director of Al-Haramain.  Doc #738-7/128-7 at 6.

28          The court acknowledges that the ethical questions arising

United States District Court

For the Northern District of California

from this case are in fact novel and difficult.  The duty to safeguard confidential client information is one of the most critical ethical obligations of a lawyer, and Mr Nelson's actions to protect this information were not unreasonable by any measure. Mr Nelson's request for expenses is, accordingly, approved.  In sum, the court GRANTS the request for $22,012.36 in costs and expenses brought by plaintiffs Belew and Ghafoor.

## III

For the reasons stated herein, the court GRANTS the motion of plaintiffs Ghafoor and Belew for liquidated damages and awards liquidated damages to those plaintiffs in the amount of $20,400 to each plaintiff.  The court DENIES the motion of plaintiff Al-Haramain for liquidated damages and all other relief, DENIES the motion of all plaintiffs for punitive damages and DENIES the motion of all plaintiffs for equitable relief (a declaration that defendants' warrantless electronic surveillance was unlawful as a violation of FISA and an order that any information obtained by means of the defendants' unlawful surveillance shall not be used by the United States government in any proceeding and shall be expunged from defendants' files and records).  Doc #723/117.

The court GRANTS the motion of plaintiffs Ghafoor and Belew for the entry of an award of attorney fees and expenses, Doc #738/128; 746/131; 748/132, and awards plaintiffs Ghafoor and Belew attorney fees in the amount of $2,515,387.09 and expenses in the amount of $22,012.36.  The court DENIES the motion of plaintiff Al-Haramain for attorney fees and expenses.

Plaintiffs request that the court dismiss the Second,

46

Third, Fourth, Fifth and Sixth claims for relief pleaded in the First Amended Complaint pursuant to Federal Rule of Civil Procedure 41(a)(2). Doc #722/116 at 1. Defendants' opposition to plaintiffs' proposed judgment states that defendants do not oppose the dismissal of these claims. Doc #727/119 at 15. Accordingly, the court GRANTS plaintiffs' request to dismiss without prejudice the Second, Third, Fourth, Fifth, and Sixth claims for relief. Doc #722/116.

The clerk is directed to enter judgment, terminate any remaining motions and close the file for Case Number 07-0109.

IT IS SO ORDERED.

_____

VAUGHN R WALKER
United States District Chief Judge

47